Nathaniel K. Charny (NC 5664)
H. Joseph Cronen (HC 4814)
Charny & Wheeler P.C.
9 West Market Street
Rhinebeck, New York 12572
Tel - (845) 876-7500
Fax - (845) 876-7501
ncharny@charnywheeler.com
jcronen@charnywheeler.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASHLEY STROKA, | |
| Plaintiff, | COMPLAINT |
| v. | Civil Action No. |
| MANUFACTURERS AND TRADERS TRUST COMPANY d/b/a M&T BANK, RAMMIE NESHEIWAT, individually, and MARK STELLWAG, individually, | JURY TRIAL DEMANDED |
| Defendants. | |

1.      Plaintiff complains, upon knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, as follows.

**Nature of the Case**

2.      Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq., and the New York State Human Rights Law ("NYSHRL"), New York State Executive Law § 290, et seq. Plaintiff seeks damages to redress the injuries Plaintiff has suffered as a result of being discriminated against, retaliated against for engaging in protected activity, and constructively terminated on the basis of Plaintiff's sex/gender (female).

1

**Jurisdiction and Venue**

3.      Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3).

4.      This Court has supplemental jurisdiction over Plaintiff's claims brought under state law pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this district pursuant to 42 U.S.C. § 2000e-5(f)(3), as it is a judicial district in the State (New York) in which the unlawful employment practices are alleged to have been committed.

**Procedural Prerequisites**

6.      Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunity Commission ("EEOC"). A copy of these charges are annexed hereto as Exhibit A.

7.      Plaintiff received a Notice of Right to Sue ("Notice") from the EEOC with respect to the herein charges of discrimination.

8.      This Action is being commenced within ninety (90) days of receipt of said Notice.

**Parties**

9.      At all times material, Defendant Manufacturers and Traders Trust Company d/b/a M&T Bank ("M&T") was a domestic business corporation operating in and existing under the laws of the State of New York.

10.      At all times material, Defendant M&T was engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e.

11.      At all times material, Defendant M&T had 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

12.     At all times material, Defendant M&T had 501 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

13.     At all times material, Defendant M&T was Plaintiff's employer under Title VII.

14.     At all times material, Defendant M&T was Plaintiff's employer under the NYSHRL.

15.     At all times material, Defendant Rammie Nesheiwat was an employee of Defendant M&T.

16.     At all times material, Defendant Nesheiwat was Plaintiff's supervisor and had supervisory authority over Plaintiff.

17.     At all times material, Defendant Nesheiwat had the power to hire Plaintiff.

18.     At all times material, Defendant Nesheiwat had the power to fire Plaintiff.

19.     At all times material, Defendant Nesheiwat had the power to demote Plaintiff.

20.     At all times material, Defendant Nesheiwat had the power to promote Plaintiff.

21.     At all times material, Defendant Nesheiwat had the power to directly affect the terms and conditions of Plaintiff's employment.

22.     At all times material, Defendant Nesheiwat had the power to direct Plaintiff's daily work activities.

23.     At all times material, Defendant Nesheiwat was Plaintiff's employer under the NYSHRL.

24.     At all times material, Defendant Mark Stellwag was an employee of Defendant M&T.

25.     At all times material, Defendant Stellwag was Plaintiff's supervisor and had supervisory authority over Plaintiff.

26.     At all times material, Defendant Stellwag had the power to hire Plaintiff.

27.     At all times material, Defendant Stellwag had the power to fire Plaintiff.

28.     At all times material, Defendant Stellwag had the power to demote Plaintiff.

29.     At all times material, Defendant Stellwag had the power to promote Plaintiff.

30.     At all times material, Defendant Stellwag had the power to directly affect the terms and conditions of Plaintiff's employment.

31.     At all times material, Defendant Stellwag had the power to direct Plaintiff's daily work activities.

32.     At all times material, Defendant Stellwag was Plaintiff's employer under the NYSHRL.

33.     Defendant Stellwag and Defendant Nesheiwat are collectively referred to herein as "Individual Defendants."

34.     Defendant M&T and the Individual Defendants are collectively referred to herein as "Defendants."

## Facts

35.     Plaintiff began her employment with Defendant M&T in June 2012 as a part-time teller.

36.     Plaintiff earned approximately $43,000 working as an administrative assistant.

37.     Plaintiff became a full-time employee soon after beginning her employment with Defendants.

38.     Except for a short stint at Rhinebeck Bank, Plaintiff was a dedicated employee of the Bank until Plaintiff's constructive discharge in May 2019.

39.     Things took their first turn for the worse upon Plaintiff's return to Defendant M&T in or around September 2015.

40.     From that point on, Plaintiff worked for Defendants out of their office in Fishkill, New York.

41.     Prior to Plaintiff's return to the Bank, one of the managers in the Fishkill Office, Defendant Nesheiwat (who at the time had no supervisory role over Plaintiff) insisted on interviewing Plaintiff, an interview that was the beginning of a stream of humiliating conduct by Defendant Nesheiwat towards Plaintiff.

42.     For months thereafter, Defendant Nesheiwat required Plaintiff to stand up at the monthly meetings in Fishkill and make a speech about Plaintiff's "bad" decision to leave Defendant M&T Bank, how Plaintiff regretted it, and how it should help everyone else to realize what a great job they had with the Bank.

43.     Plaintiff cooperated with Defendant Nesheiwat's humiliating demands in this regard for approximately four such meetings before Plaintiff was allowed by Defendant Nesheiwat to stop the required public humiliation.

44.     In January 2018 Plaintiff was promoted to Administrative Assistant II.

45.     At that time, Plaintiff was assigned to be Defendant Nesheiwat's administrative assistant.

46.     At that point and from thereon, Defendant Nesheiwat's treatment of Plaintiff was infused with a gender-based hostility that was severe, pervasive, and unwelcome.

47.     For example, immediately upon Plaintiff's assignment and continuing until Plaintiff's constructive termination from employment, Defendant Nesheiwat required Plaintiff to fetch him coffee whenever he so demanded.

48.     In addition, Defendant Nesheiwat would often contact Plaintiff while he was in meetings and demand that Plaintiff fetch him "a bottle of water."

49.     On at least one occasion, Defendant Nesheiwat berated Plaintiff because the water was not cold enough for him and demanded that Plaintiff fetch him a cold bottle of water.

50.     At luncheons, Defendant Nesheiwat would frequently demand that Plaintiff fetch him plates of food from the buffet line while he stayed seated at one of the tables, or even just stayed at his office.

51.     More offensively, Defendant Nesheiwat commented on Plaintiff's appearance almost every day -- sometimes more than once -- and would leer at Plaintiff's body while saying something along the lines of "you look nice today."

52.     When Plaintiff wore a certain skirt that apparently titillated Defendant Nesheiwat, he announced "Oh, that's my favorite outfit."

53.     Plaintiff never wore that outfit again.

54.     On this particular day, Defendant Nesheiwat followed Plaintiff up a flight of stairs in the office.

55.     Once at the top of the stairs, Defendant Nesheiwat announced that Plaintiff had "a run in [her] stockings."

56.     This comment was grotesque and unwelcome, but even more so since the "run in [Plaintiff's] stockings" was well above Plaintiff's hem line -- meaning that Defendant Nesheiwat was looking up Plaintiff's skirt as they climbed the stairs and obviously Defendant Nesheiwat wanted Plaintiff to know that Defendant Nesheiwat have been engaging in such lecherous conduct.

57.     Plaintiff took her lunch break that day to purchase a new pair of stockings.

58.     Defendant Nesheiwat's inappropriate behavior was incessant.

59.     He bought Plaintiff flowers on Valentine's Day.

60.     On Administrative Assistant Day he bought Plaintiff an obnoxiously large bouquet of flowers and instructed Plaintiff to "bring these home to your husband so he can learn how to treat you."

61.     The next day, Defendant Nesheiwat interrogated Plaintiff about the flowers. Defendant Nesheiwat asked if Plaintiff had brought the flowers home and if Plaintiff's husband had sufficiently learned whatever lesson Defendant Nesheiwat perceived was necessary.

62.     Plaintiff responded that Plaintiff had not brought the flowers home.

63.     Defendant Nesheiwat was angry that Plaintiff had not followed his instructions.

64.     For Christmas 2018, Defendant Nesheiwat purchased other clerical staff $50 spa gift certificates.

65.     However, Defendant Nesheiwat insisted on taking Plaintiff to lunch.

66.     At this lunch, Defendant Nesheiwat gave Plaintiff a $100 gift certificate and a bottle of wine.

67.     Plaintiff refused these gifts as they were unwelcome and inappropriate, saying at the time that that the gifts were excessive.

68.     Defendant Nesheiwat's unwelcome behavior included grotesque jealousy when other male employees interacted with Plaintiff.

69.     For example, after another male colleague (David DeVito) would stop by Plaintiff's desk or in any way interact with Plaintiff, Defendant Nesheiwat would regularly summon Plaintiff to his office, close the door, and scold Plaintiff.

70.     Defendant Nesheiwat would then tell Plaintiff that Plaintiff should not be spending time with Mr. DeVito because Mr. DeVito was not treating Plaintiff with the same level of (unwanted) attention that Defendant Nesheiwat had imposed on Plaintiff.

71.     Also around Christmas 2018, Defendant Nesheiwat demanded that Plaintiff attend the Paige Lumber holiday party with him.

72.     Paige Lumber was a customer of Defendant M&T Bank.

73.     Plaintiff refused as Defendant Nesheiwat's unwelcome advances were frightening and grotesque.

74.     However, Plaintiff did attend the party on Plaintiff's own and specifically not as Defendant Nesheiwat's companion.

75.     At the party Plaintiff briefly chatted with Mr. Devito.

76.     Defendant Nesheiwat later pulled Plaintiff aside at the party, and angrily berated Plaintiff for not attending the party with Defendant Nesheiwat and stating: "You see [Mr. DeVito] is not paying attention to you, he does not care about you the way I care about you."

77.     Around February 2019, Defendant Nesheiwat again summoned Plaintiff to his office, closed the door, and demanded that Plaintiff take the Valentine's Day candy off Plaintiff's desk and bring it to Defendant Nesheiwat's office because "I do not want David to say 'be mine' to you."

78.     On many occasions Defendant Nesheiwat would suggest to Plaintiff in the mid-afternoon: "Let's just call it a day and get a drink!"

79.     It was obvious and apparent that Defendant Nesheiwat was making unwelcome sexual and romantic advances towards Plaintiff.

8

80.     Plaintiff would routinely deny these unwelcome advances, and each time Defendant Nesheiwat would get angry and sulk for hours and sometimes days.

81.     Defendant Nesheiwat's manipulation of Plaintiff's assignments is also illustrative of the gender-based hostile work environment.

82.     Plaintiff had repeatedly asked Defendant Nesheiwat if Plaintiff could work from the Rhinebeck office (Plaintiff live in Rhinebeck) on days with inclement weather because such accommodation would assist Plaintiff in managing the activities of Plaintiff's young daughter.

83.     Defendant Nesheiwat always refused these requests -- except on the few occasions where Defendant Nesheiwat was in the Rhinebeck area -- in which case Defendant Nesheiwat would allow Plaintiff to work from the Rhinebeck office provided that Plaintiff had lunch with him.

84.     In or around April 2019 Defendant Nesheiwat cornered Plaintiff mid-day and commented that Plaintiff must have gotten her hair cut.

85.     Defendant Nesheiwat explained that he had been watching Plaintiff walk from behind and saw that Plaintiff's hair was usually at a specific distance from the straps on the back of the particular dress Plaintiff was wearing, but that on that day Plaintiff's hair was further away.

86.     On several occasions, Defendant Nesheiwat commented that he preferred Plaintiff with straight hair rather than with curly hair.

87.     Most egregious and most disgusting was Defendant Nesheiwat's unwelcome touching.

88.     Defendant Nesheiwat made a habit of insisting on hugging Plaintiff several times while they were working together again.

89.     When he hugged Plaintiff, he would at times touch Plaintiff's hips in a grotesque and unwelcome manner.

90.     Defendant Neshewait would then release the hug but then leave his hands lingering on Plaintiff's hips.

91.     Plaintiff would often refuse the advance, but to no avail since Defendant Nesheiwat would nonetheless insist on hugging Plaintiff and touching Plaintiff in this unwelcome and prurient fashion.

92.     Plaintiff never invited any of these hugs or gave any indication that they were welcome.

93.     Many of these interactions occurred in Ms. Nesheiwat's office.

94.     Defendant Nesheiwat's office had an automatic lock.

95.     Because of the automatic lock, Defendant Nesheiwat's office was always locked during these unwelcome interactions.

96.     Being in Defendant Nesheiwat's locked office while he sexually harassed Plaintiff was terrifying, humiliating, infuriating, and degrading.

97.     Defendant Nesheiwat subjected Plaintiff to this unwelcome severe and pervasive hostile work environment for the entire time Plaintiff reported to Defendant Nesheiwat.

98.     Defendant Nesheiwat's behavior became unbearable for Plaintiff.

99.     Plaintiff woke up each morning afraid to go to work, trembling with fear of what the day would bring in terms of gender-based humiliation.

100.    On or about April 29, 2019, Plaintiff quit her job and gave a notice period such that her last day would be May 17, 2019.

101.    Defendant Nesheiwat's behavior was so outrageous that it would have compelled a reasonable person to resign.

102.    Any reasonable person in Plaintiff's position would have felt compelled to resign.

103.    Soon thereafter two remarkable things occurred.

104.    First, Defendant Nesheiwat complained to Plaintiff about Plaintiff quitting.

105.    Defendant Nesheiwat insisted that he and Plaintiff continue to meet monthly "for drinks."

106.    Defendant Nesheiwat then aggressively grabbed Plaintiff and gave Plaintiff one final disgusting "hug," complete with thigh and hip grinding.

107.    Second, Plaintiff met with the Regional President, Defendant Stellwag to report on the reasons for Plaintiff's resignation, including reporting the gender-based hostility within the workplace perpetrated by Defendant Nesheiwat.

108.    In so doing, Plaintiff engaged protected activity under the NYSHRL and Title VII.

109.    Plaintiff hoped that the Bank would take appropriate steps to keep Defendant Nesheiwat under control so that the next female assistant under Defendant Nesheiwat's supervision would not experience what Plaintiff had gone through.

110.    Remarkably, and causing severe mental anguish, Defendant Stellwag explicitly blamed Plaintiff for Defendant Nesheiwat's misconduct -- telling Plaintiff that Plaintiff had been asking for such treatment because Plaintiff let it go on for so long.

111.    Defendant Stellwag concluded the meeting by stating "The fact that you let it go on for so long means that you were accepting of it."

112.    Plaintiff was stunned, outraged, humiliated, and felt betrayed following this meeting.

113.    Defendant Stellwag's outrageous behavior created a hostile work environment for Plaintiff.

114.    Defendant Stellwag created this hostile work environment to retaliate against Plaintiff for complaining of sex/gender-based discrimination.

115.    Defendant M&T knew or should have known of the discriminatory and retaliatory conduct and failed to take corrective measures within its control.

116.    But for Defendant Nesheiwat's position at Defendant M&T, Defendant Nesheiwat would not have been able to subject Plaintiff to the discriminatory treatment alleged above.

117.    But for Defendant Stellwag's position at Defendant M&T, Defendant Stellwag would not have been able to subject Plaintiff to the discriminatory and retaliatory treatment alleged above.

118.    Plaintiff was repulsed, offended, disturbed, humiliated, and disgusted by this blatantly unlawful termination.

119.    Defendants created a hostile work environment which unreasonably interfered with Plaintiff's ability to perform Plaintiff's job.

120.    The above are just some of the ways Defendants regularly and continually harassed, retaliated against, and discriminated against Plaintiff while employing Plaintiff.

121.    Defendants treated Plaintiff this way due to Plaintiff's sex/gender (female).

122.    Defendants treated Plaintiff this way because Plaintiff complained of discrimination.

123.    Defendants acted intentionally and intended to harm Plaintiff.

124.    Defendants unlawfully discriminated against, humiliated, degraded, and belittled Plaintiff. As a result, Plaintiff suffers loss of rights, emotional distress, and loss of income.

125.    Plaintiff's performance was, upon information and belief, at least above average and satisfactory while working for Defendants.

126.    Plaintiff was qualified for her position with Defendants.

127.    As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of employment, income, the loss of a salary, loss of bonus, loss of benefits, other compensation which such employment entails, special damages, and great inconvenience.

128.    Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

129.    Defendants acted maliciously, willfully, outrageously, and with full knowledge of the law.

130.    As such, Plaintiff demands punitive damages as against all Defendants, jointly and severally.

**First Cause of Action for Discrimination
Under Title VII**

131.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

132.    Title VII of the Civil Rights Act of 1964, as amended, at 42 U.S.C. § 2000e–2(a), titled "employer practices," provides that:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

13

>  (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

133.    Defendant M&T violated the section(s) cited as set forth.

## Second Cause of Action for Retaliation
## Under Title VII

134.    Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this complaint.

135.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a)

provides that:

>  It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

136.    Defendant M&T violated the sections cited herein as set forth.

## Third Cause of Action for Discrimination
## Under the New York State Executive Law

137.    Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this complaint.

138.    New York State Executive Law § 296(1) provides that:

>  It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

139.    Defendants violated the section(s) cited as set forth.

### Fourth Cause of Action for Discrimination
### Under the New York State Executive Law

140.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

141.    New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

142.    Individual Defendants violated the section(s) cited as set forth.

### Fifth Cause of Action for Retaliation
### Under the New York State Executive Law

143.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

144.    New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

145.    Defendants violated the section cited herein as set forth.

### Jury Demand

146.    Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A.    Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et. seq., and the New York State Human Rights Law, New York State Executive Law § 290, et seq., in that Defendants discriminated against Plaintiff based on Plaintiff's sex/gender, retaliated against Plaintiff, and wrongfully terminated Plaintiff;

15

B.  Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination, retaliation, and conduct and to otherwise make Plaintiff whole for any losses suffered because of such unlawful employment practices;

C.  Awarding Plaintiff compensatory damages for mental and emotional injury, distress, pain, suffering, and injury to Plaintiff's reputation in an amount to be proven;

D.  Awarding Plaintiff punitive damages;

E.  Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

F.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendants' unlawful employment practices and conduct.

Dated:  Rhinebeck, New York
        July 25, 2022

_Nathaniel K Charny_

Nathaniel K. Charny (NC 5664)
H. Joseph Cronen (HC 4814)
Charny & Wheeler P.C.
9 West Market Street
Rhinebeck, New York 12572
T - (845) 876-7500
F - (845) 876-7501
ncharny@charnywheeler.com
jcronen@charnywheeler.com

Attorneys for Plaintiff